## Case No. 8,727.

### McCORMICK v. SEYMOUR et al.

[3 Blatchf. 209; Merw. Pat. Inv. 657.] [1]

Circuit Court, N. D. New York. Oct., 1854. [2]

PATENTS — REAPING MACHINE — IMPROVEMENT—NOVELTY—UNFOUNDED CLAIM—MEASURE OF DAMAGES—INFRINGEMENT.

1. The history of McCormick's improvements in reaping machines, set forth.

2. The difficulties under which the inventors of improvements in reaping machines labor in making experiments, considered.

3. An improvement upon a machine, to constitute it an invention, within the meaning of the 6th section of the act of July 4, 1836 (5 Stat. 119), must be new and useful.

4. What is novelty in an invention, defined.

5. The case of Russell v. Cowley, 1 Webst. Pat. Cas. 467, cited and approved. Considera-

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission. Merw. Pat. Inv. 657, contains only a partial report.]

[2] [Affirmed in part in 19 How. (60 U. S.) 96.]

tions stated, bearing upon the question of the novelty of the inventions of the divider, and the arrangement of the reel-post, claimed in McCormick's patent of January 31st, 1845, for improvements in reaping machines.

6. The means stated for determining whether those claims of that patent are infringed.

7. If a patentee makes an unfounded claim, in the same patent with other claims which are well founded, he may disclaim, within a reasonable time, what he had no right to claim, and then his patent will be as good for the residue, as if it had originally issued only for the valid claims.

8. If he omits to disclaim, and it appears, on the trial of a suit brought by him on his patent, that he is entitled to be protected as to a part of his claims, but not as to another part, he is still entitled to damages for the violation of the valid part of his claims, but he recovers no costs.

[Cited in Electrical Accumulator Co. v. Julien Electric Co., 38 Fed. 136.]

9. If, however, the jury are satisfied that there has been unreasonable negligence and delay, on his part, in disclaiming the invalid part of his patent, then the whole patent is inoperative.

10. The second claim in McCormick's patent of 1845, construed.

11. Where a patentee is accustomed to sell rights under his patent, his customary charge for the right is the measure of the damages he is entitled to recover for an infringement, with interest from the time of infringement.

[Cited in Graham v. Plano Manuf'g Co., 35 Fed. 598.]

[Cited in Dean v. Charlton, 23 Wis. 612.]

12. But, where a patentee does not sell rights under his patent, but uses his invention exclusively himself, and furnishes the community with articles of his own manufacture, made under his patent, the measure of damages is different.

13. In the latter case, if the patent is for an entire machine, the measure of damages is the profits the patentee could have made in constructing and vending the machine, over and above the mere profits of its mechanical construction. The profits that grow out of the exclusive right to manufacture the invention under the patent, belong to the patentee; while the mere mechanical profits are to be excluded from the damages.

14. If, in the latter case, the invention is of an improvement on a machine, the patentee is entitled, as a measure of damages, to all the advantages of the use of the improvement, excluding the profits of the manufacture, and excluding, also, the value, if any, of the use of the old machine.

15. Under the 14th section of the act of July 4th, 1836, the jury are limited to the actual damages sustained by the plaintiff.

This was an action in the case, for the infringement of letters patent. The declaration was founded on two letters patent granted to the plaintiff—one on the 31st of January, 1845 [No. 3,895], and the other on the 23d of October, 1847 [No. 5,335, re-issued May 24, 1853, No. 239]. It was tried on both of the patents in June, 1851, when the jury failed to agree on a verdict. It was again tried in October, 1851, only on the patent of October 23d, 1847, when a verdict was found for the plaintiff [Cyrus H. McCormick], for $17,306 66. Those trials are reported [Case No. 8,726]. The defendants [William H. Seymour and Dayton S. Morgan], after judgment, sued out a writ of error to the supreme court,

which reversed the judgment, and awarded a venire facias de novo, for an error in the charge of this court as to the rule of damages. See Seymour v. McCormick, 16 How. [57 U. S.] 480. The case now came on for trial, solely on the patent of January 31st, 1845.

William H. Seward, Charles M. Keller, and Samuel Blatchford, for plaintiff.

Nicholas Hill, Jr., Henry R. Selden, and John K. Porter, for defendants.

Before NELSON, Circuit Justice, and HALL, District Judge.

NELSON, Circuit Justice (charging jury). The patent upon which this action is founded, was issued to the plaintiff on the 31st of January, 1845, for an improvement in reaping machines. The history of the improvements made by the plaintiff in reaping machines, has been developed by the evidence in the progress of the trial. It seems that his experiments began as early as 1830 or 1831, and continued from year to year, down to 1834, when he first obtained a patent for his machine. This machine, however, was not a successful one, and but comparatively few were either manufactured or sold. It was found by the farmers who tried them, that they would not work successfully or profitably; and this seems to have been the fate of the experiments made with the machines down to 1845, when a second patent was taken out for improvements upon the first one. And even then, although the machine, as thus improved, was regarded by the farming interest as more valuable than the original one, yet in consequence of the difficulties in raking the cut grain from the platform, the machine did not go into general or successful operation until after the arrangement of the seat for the raker upon it, which was patented in 1847. Then the machine became eminently successful, and has since gone into very general use. According to the evidence on this trial, only seven machines of the construction as patented in 1834 were sold, down to 1842. Some twenty-nine were sold for the harvest of 1843, the patentee warranting the successful operation of the machine. Some fifty were sold for the harvest of 1844, and from one hundred to two hundred for the harvest of 1845.

The inventors of improvements upon reaping machines labor under disadvantages and embarrassments that are not common to inventors generally: and this for the reason that experiments with, and trials of reaping machines, can be made only during harvest time. When the harvest is over, the opportunity for experiment and trial has passed away, and the inventor is obliged to wait until the succeeding harvest in the next year, to test any improvements that may have been suggested. Not so with other inventors. They can test their improvements or discoveries from day to day continuously, until they have perfected them. This suggestion

no doubt accounts for the series of years occupied by the plaintiff in seeking to perfect his improvements on the reaping machine.

The improvements which were patented in 1845, and which are claimed by the plaintiff to have perfected his machine of 1834, so far as it respects cutting the grain and laying it on the platform, are two, the divider, and the re-arrangement of the reel-post. Now, it is said that neither of these improvements, assuming that the plaintiff was the author of them, is of a description entitling it to be regarded as the subject of a patent under our patent law—in other words, that there is nothing of invention to be found in these improvements, nothing of intellect, or of mind, or of thought, that is new or useful—and that therefore they are not the subjects of protection under the law. We desire to call your attention for a few moments to this branch of the case, because the objection just alluded to has been made one of the strong grounds of objection to the right of the plaintiff to recover, and has been elaborately discussed by the learned counsel for the defendants. This case has, as you have learned, been heretofore before this court; and we shall, for brevity, refer to the remarks submitted by us to a former jury upon this branch of the case. The 6th section of the patent act of July 4, 1836, provides, in substance, that any person having discovered or invented any new or useful art, machine, manufacture, or composition of matter, or any new and useful improvement on any art, machine, manufacture, or composition of matter, not known or used by others before his discovery or invention, and not, at the time of his application for a patent, in public use or on sale with his consent, may make application to the commissioner of patents, and shall be entitled to a patent. An improvement upon a machine, to constitute it an invention, within the meaning of the law, must be new, not known or in use before; and it must also be useful. In other words, and in perhaps clearer terms, the person claiming the improvement, must have found out himself, and created and constructed, an improvement which had not before been found out or produced by any person, and which is beneficial to the public. There must be novelty in the arrangement of the improved machinery—novelty created by the mind of the person claiming to be the inventor; and, in connection with that species of novelty, there must be utility. This novelty, worked out by the mind of the inventor, connected with utility, constitutes the essence of a patentable subject under the law.

It is exceedingly difficult to draw a line between what may be regarded by the eye as a small improvement or invention, and one of magnitude. Oftentimes, improvements and discoveries the most important in their consequences, and in their beneficial effects on the business interests of the community, are among the simplest ideas of the mind. Again, you will find improvements of less magnitude

in their consequences and in their beneficial effects, indicating a most laborious and complex exertion of the mind of the inventor. As an illustration of this subject, and one from which you may be enabled to arrive at a proper view of this branch of the case, we refer to an improvement that has been tried in a court of law, and sustained. We allude to the case of Russell v. Cowley, 1 Webst. Pat. Cas. 467, where it was held to be a patentable improvement, to weld iron tubes by means of grooved rollers without a mandrel, such tubes having previously been welded by grooved rollers upon a mandrel. Now, to the eye, the change in the instance referred to was exceedingly simple. Previously to the improvement, the two edges of the iron cylinder which was to form the tube, were brought together and heated, and then the cylinder was drawn through rollers having a circular aperture smaller than the exterior circumference to be given to the tube, the cylinder being all the while supported on the inside by a mandrel. The edges were thus welded as effectually as by the hammer and anvil, and more accurately. But the mandrel was an embarrassment, because it had to be used in the bore of each tube while it was being drawn through the aperture in the rollers. And the idea occurred to the patentee. (Whitehouse), that the edges could be welded as well in the absence of a mandrel as with it. He, therefore, conceived the idea of throwing away the mandrel, and welding the tube without it, and succeeded, thereby getting rid of the trouble of inserting it in welding every tube. This was held to be a patentable discovery. The getting rid of the mandrel from the bore of the tube, in the operation of welding, it, was so useful an idea, that it was held to constitute a patentable subject under the English law, which is no broader than our own statute, and, indeed, scarcely as broad.

If you should come to the conclusion that the improvements by the plaintiff in the divider, and in the arrangement of the reel-post, are properly the subjects of a patent, then it is said by the learned counsel for the defendants, that there was nothing new in them, that they were before discovered and used, and that the plaintiff has simply appropriated the ideas and skill of others in the arrangement of these improvements. and is therefore not entitled to be regarded as their inventor or discoverer. Upon this point of the case you have been referred to the patent and machine of Schenebley, in 1833; to the patent of Hussey, also in 1833; to the patent and machine of Moore and Hascall, in 1836; to the patents and machines of Reed, in 1842, and of Woodward, in 1845; and to the Bell machine—six machines in all. The patents of all these machines, except Bell's, and the description of that machine, as contained in Loudon's Encyclopedia, have been read in the course of the trial. The position taken by the learned counsel for the defendants is, that these improvements in the divider

and in the arrangement of the reel-post are to be found in some one or all of these several machines, and that, therefore, there was nothing new in these improvements on the part of the patentee in this case.

There are one or two general observations on this part of the subject which we think it proper to submit to you. With the exception of the patent and machine of Hussey, for aught that appears before us on this trial, not one of the machines referred to ever went into general or successful operation. Why they failed we do not know. What was the secret of their failure we are not informed. What were the defects in their arrangement or construction we are not told. All we know is that, from the evidence in the case, every one of them turned out, in the end, to be an unsuccessful experiment in the way of the construction of a mechanical reaper. It has been supposed that Bell's machine was an exception. But, upon looking into the evidence bearing upon this machine, we scarcely think it an exception to the other machines that turned out to be failures. Bell, it seems, constructed his machine as early as 1828 or 1829. The last account given of it in London's work was in 1829. From that work it appears that, at that time, it succeeded in cutting some one or two acres or more of grain. But, from 1829 down to 1853, at which latter date the witness Hussey testifies to its operation, we have no account whatever of this machine. We have no evidence here showing that during that interval the machine was in operation at all; and, in the absence of such proof, it seems to us that no other inference can be drawn, than that there must have been some defects in the arrangement and construction of that machine. It is true, as testified to by Hussey, that in 1853, on a trial which took place in Scotland or the north of England between Bell's and Hussey's and McCormick's machines, Bell's proved the most successful in cutting and laying the grain; and, from that testimony, it would seem to have become a practical machine. But this was in the harvest of 1853, two years after the exhibition in the Crystal Palace, where Hussey's and McCormick's machines were exhibited. During the harvest of 1851, those two machines were repeatedly tried in the neighborhood of the Crystal Palace, and they were again tried in the harvest of 1852. Bell's machine was not on exhibition in the Crystal Palace, for aught that appears. We hear nothing of it there, and it was not a competitor with either Hussey's or McCormick's machine during the harvest of 1851. Nor do we hear of it in 1852, in any trial with the other machines. And it is not till the harvest of 1853 that we hear of the Bell machine coming into competition with the two American machines, as a successful reaping machine. In point of fact, therefore, it would seem, for aught that appears from the testimony in this case, that notwithstanding there have been seven attempts, and six of

those American, to construct a successful reaping machine, but two out of the seven have ultimately become beneficial and useful instruments for the purposes for which they were constructed—that is, the machine of Hussey and the machine of McCormick. It appears, from the evidence in the case, that Hussey and McCormick turned their attention to the construction of a reaping machine very nearly at the same period—McCormick two or three years the earlier. They have persevered from that time down to the present, and they have each of them, it is conceded, brought out a successful reaping machine. All the others failed, failed early, gave up the pursuit, and abandoned their machines.

Between Hussey's and McCormick's machines, there seems to have been no conflict, except as their inventors were competitors for the reputation and profit of bringing out a successful machine. They do not appear to have been rivals, as regards any portion of the arrangement of their respective machines. And, indeed, on comparing them, it will be seen that they are materially different, and, in many parts, dependent on different principles and operations, for the purpose of producing the one common result.

It is said that, notwithstanding the several machines to which we have referred turned out to be unsuccessful and were abandoned, yet there existed in some of them the divider and the arrangement of the reel-post claimed by the plaintiff; and that, admitting that the machines failed as reaping machines, yet, if the arrangements of the divider and of the reel-post, claimed by the plaintiff, are found to have existed in those machines anterior to the invention of these improvements by the plaintiff, that is sufficient to show that the plaintiff was not the first inventor or discoverer of these improvements. And no doubt the position is well-founded, provided the fact has been established.

Without calling your attention minutely to the identity of arrangement claimed by the defendants to exist, in regard to the two improvements in controversy, between the plaintiff's machine and those prior to his, it is sufficient to state, that the horizontal-wedge-divider, which several of these machines used, is alleged by the defendants to embody all the elements and produce all the results to be found in the divider of the plaintiff. Now, it seems to be conceded that the plaintiff himself had, in his machine of 1834, the horizontal-wedge-divider. But that machine, like the machines that were brought into existence by the other persons who had turned their attention to the subject, failed in its operation; and, as is claimed by the plaintiff, it failed partially, if not wholly, in consequence of the difficulty in dividing the cut from the uncut grain. The machine would divide the grain when it was standing, without much difficulty; but it would not divide it successfully when tangled, broken down, and lodged; and therefore it failed to cut grain success-

fully. You will find, on looking at the plaintiff's specification, that this was the difficulty which he was seeking to overcome. He says: "The divider, K, is an extension of the frame on the left side of the platform, say three feet before the blade, for the purpose and so constructed as to effect a separation of the wheat to be cut from that to be left standing, and that whether tangled or not." Again he says: "By means of the bow to bear off the standing wheat, and the iron" (that is, the inside iron) "to throw the wheat to be cut within the powers of the reel, the required separation is made complete," whether the grain is tangled or not. The plaintiff was seeking to obtain a divider that would not only divide the standing grain, but one that could be successfully used for dividing grain whether standing, or tangled, or lodged, or broken. It is for you to say, from the evidence, whether he has been successful; and whether he has constructed an improvement in reaping machines that will not only accomplish reasonably the purpose aimed at, but one that was never before made by any other person. It is for you to say whether it is an answer to the novelty of the plaintiff's arrangement, that the horizontal wedge-divider was before in use, and whether that divider contains all the elements, and produces all the effects in its operation, that are contained in and produced by the divider of the plaintiff. It seems, from the testimony of all the witnesses, that there is no great difficulty in dividing the grain, in the operation of reaping, where it stands erect. They say that the reel is of no great utility where the grain is not tangled or leaning; that the operation of Hussey's machine, without the reel, is as successful as that of any other, in cutting standing grain; that the difficulty commences in tangled grain; and that, as great portions of the grain during the harvest, portions perhaps of every field, are in that condition, a machine would be comparatively useless that could operate only on standing grain, leaving that which is tangled to be cut by some other instrument.

These observations are also applicable to the other branch of the case. The reel-post in the original machine was, as you will recollect, an upright post, standing in advance of the cutters and sustaining the reel. The foot of that post was then removed back; but, inasmuch as, if the post were to be perpendicular, from the new position of its foot, there would be no sufficient support for the reel, the post was bent, so as to bring its top very nearly to the same position it occupied when the post was upright. This arrangement became necessary for the purpose of removing an impediment in the way of the construction of the plaintiff's divider, and it was also necessary in order to avoid the difficulty occasioned by the straw clogging upon the foot of the post.

It has been argued, with great confidence, by the learned counsel for the defendants, that this re-arrangement of the reel-post did not require invention, but only the skill of the mechanic; that it did not require learning, or thought, or intellect, in order to bring about this re-arrangement, and have the reel-post accomplish the object for which it was originally constructed. We have called your attention to what are patentable subjects, and we refer you to the illustration we have already given, to aid you in arriving at the conclusion, whether this re-arrangement of the reel-post is or is not a discovery, within the meaning of the patent law. This is a question of fact, for you to determine.

It is then said, on the part of the counsel for the defendants, that, assuming the plaintiff to be the inventor of the divider, and of the arrangement of the reel-post, and that they were the subjects of invention, so as to entitle the first discoverer of them to a patent, and that the plaintiff is entitled to be protected in the exclusive enjoyment of these improvements, yet he has no right of action against the defendants, on the ground that their divider and their arrangement of the reel-post are substantially different from those of the plaintiff. It will be necessary for you to turn your attention to this question, and to pass upon it. In order to ascertain whether the arrangement of the defendants' divider is substantially the same with, or substantially different from, the arrangement of the plaintiff's, it will be necessary for you to examine the divider of the defendants, to see whether or not they have availed themselves of the construction, and operation upon tangled and beaten grain, to be found in that devised by the plaintiff. In other words, you are to see whether the arrangement and practical operation of the defendants' divider, in dividing the cut from the uncut grain, are substantially similar; whether it involves, in its construction and operation, the same principles and ideas to be found embodied in the divider of the plaintiff.

It is claimed, on the part of the plaintiff, that, by the peculiar arrangement of his divider, it enters the grain near to the ground, and that then, owing to the construction of the outer bow and of the inner iron, the divider, instead of operating like a wedge which is merely horizontal, rises upon the grain, as the machine advances, crowding on the outside the uncut grain away from the machine, and untangling the tangled straw, and at the same time turning it inward, so that it may come within reach of the reel, and within the action of the cutting instrument. This is the beneficial operation claimed for the plaintiff's divider. Now, if the plaintiff has succeeded in satisfying you that this divider is a contrivance of his, and that it produces the useful effect that is claimed, then, any arrangement of machinery embracing substantially the same operation in the division of the grain, by entering it near the ground, and the rising and spreading, untangling and dividing as it rises, is an infringement, within

the meaning of the patent law. It will be for you to examine the arrangement of the defendants and the arrangement of the plaintiff, and, with this guide, to determine whether or not the defendants' arrangement embodies the same practical construction and operation, in the division of tangled wheat, found in the plaintiff's. The same remarks are applicable to the reel-post. We have stated the principles of law which are to govern your investigation; and you will take up the facts, and determine whether the arrangements of the defendants, in both respects, are or are not substantially the same as the plaintiff's. If they are, then the defendants have appropriated the ideas of the plaintiff. If they are not, then they are independent arrangements, and do not interfere with the plaintiff's.

It is perhaps proper to say, in this connection, that the defendants in this case do not belong to the class who had turned their attention to the construction of a successful reaping machine. It seems that their first connection with these machines was in 1845, when they were employed by McCormick to manufacture his reapers in the Western part of this state. They were also employed to construct machines for him for the harvest of 1846, and also for the harvest of 1847, containing the improvements in controversy. This seems to have been their first connection either with a reaper or with McCormick's machine. Having been employed to construct his machine containing this divider and this arrangement of the reel-post, they had the best opportunity to learn the principles on which McCormick had arranged those parts of his machine by means of which he was then about to succeed in making it a useful machine, and one that would go into general use among the farmers of the country. It is, therefore, your duty to look well into this branch of the case, and see whether the defendants have done any thing more than appropriate the ideas of the plaintiff which they found embodied in those parts of his machine, or whether they have made use of an independent arrangement. If the latter, then they are not infringers. If otherwise, then they are.

This is all that we deem it necessary to say to you on what may be regarded as the merits of this case. There are one or two other points, however, to which it is proper we should briefly call your attention. One of these turns upon the construction to be given to a claim in the patent. It is said by the learned counsel for the defendants, that there is a claim in the patent, outside of the two claims that are in controversy, which is void, because McCormick appears, from the evidence, not to have been its original and first inventor; and that, inasmuch as he has made one void claim, his patent is void as it respects all the other claims, although the evidence may show that he was the original and first inventor of all those other claims. As regards the law applicable to this point,

the learned counsel is not strictly correct. The law is this: If a patentee makes a claim which is not well founded, in the same patent with other claims which are well founded, he may disclaim, within a reasonable time, that which he had no right to claim, and then his patent will be good as to the residue —as good as if it had originally issued only for the claims which are valid. If he omits to make a disclaimer, but brings a suit for the violation of his patent, and it satisfactorily appears, upon the trial, that he is entitled to be protected in a portion of the claims set up in his patent, but that he is not entitled to be protected in respect to another portion, he is still entitled to damages for the violation of the valid portion of his claims, the same as if all the claims were valid, so far as regards the mere right of recovery; but he gets no costs. That is the law. It has this qualification: If the jury are satisfied that there has been unreasonable negligence and delay on the part of the patentee, in making a disclaimer as respects the invalid part of his patent, then the whole patent is inoperative, and the verdict must be for the defendants. As in this case. The claim on which the question arises is as follows: "I claim the reversed angle of the teeth of the blade, in manner described." It is said by the defendants, that the plaintiff was not the first inventor of that arrangement, but that Moore was. Assuming that the position of the learned counsel for the defendants is right, that the plaintiff was not the first inventor of what is claimed in that claim, if you believe that he was the first inventor of the divider and of the arrangement of the reel-post, he may still be entitled to recover damages, unless he has unreasonably neglected and delayed to enter a disclaimer for what is covered by the claim in regard to the reversed angle of the teeth.

The claim in question is founded upon two parts of the patent. As the construction of that claim is a question of law, we shall construe it for your guidance. In the first part of the patent, we have a description of the blade and of the blade-case and of the cutter, and of the mode of fastening the blade and the blade-case and the cutter, and of the machinery by which the arrangement is made for the cutter to work. We have also a description of the spear-shaped fingers, and of the mode by which the cutter acts in connection with those fingers. Then, among the claims, are these: "2. I claim the reversed angle of the teeth of the blade, in manner described. 3. I claim the arrangement of the construction of the fingers, (or teeth for supporting the grain), so as to form the angular spaces in front of the blade, as and for the purpose described." Now, it is insisted on the part of the learned counsel for the defendants, that this second claim is one simply for the reversed angles of the sickle-teeth of the blade. These teeth are common sickle-teeth, with their angles al-

ternately reversed, in spaces of an inch and a quarter, more or less. The defendants insist that the second claim is merely for the reversed teeth on the edge of the cutter, and that the reversing of the teeth of the common sickle, as a cutter in a reaping machine, was not new with the plaintiff; and that, if it was new with him, he had discovered it and used it long before his patent of 1845. The defendants claim that Moore had discovered it as early as 1837 or 1838; and it would also seem, that the plaintiff had devised and used it at a very early day after his patent of 1834—that is, the mere reversing of the teeth. But, on looking into the plaintiff's patent more critically, we are inclined to think that, when the plaintiff says, in his second claim, "I claim the reversed angle of the teeth of the blade, in manner described," he means to claim the reversing of the angles of the teeth in the manner previously described in his patent. You will recollect that it has been shown, in the course of the trial, that, in the operation of the machine, the straw comes into the acute-angled spaces on each side of the spear-shaped fingers, and that the angles of the fingers operate to hold the straws, while the sickle-teeth, being reversed, cut in both directions, as the blade vibrates. The reversed teeth thus enable the patentee to avail himself of the angles on both sides of the spear-shaped fingers; whereas, if the sickle-teeth were not reversed in sections, but all ran in one direction, like the teeth of the common sickle, he could use the acute angles upon only one side of the fingers, because the cutter could cut in only one direction. We are, therefore, inclined to think, that the patentee intended to claim, by his second claim, the angles thus formed by the peculiar shape of the fingers, in connection with the cutter having the angles of its teeth reversed. And, as it is not pretended that any person invented that improvement prior to the plaintiff, the point relied on in this respect by the learned counsel for the defendants fails.

We have now said all that we intend to trouble you with, except a few words on the subject of damages. This case has already been before this court, and went up from here to the supreme court, and was there reversed upon the point of damages. The supreme court held, that the principles laid down by this court, upon the former trial, to govern the jury in regard to the measure of damages, were erroneous, and, for that reason, granted a new trial. We have, therefore, some light, upon this question of damages, which we did not possess at the former trial. And we shall, on this occasion, follow the principles laid down by the supreme court for our guidance. As we understand the opinion of the court, it lays down these principles: In cases where a patentee avails himself of his invention, and of his exclusive right to the enjoyment of its profits, by putting it into market, and selling rights under it, as is most usually the case with inventors—that is, rights for states, or counties, or smaller districts, or portions of the invention itself—in such cases, the customary charge for the right to use the patented invention is the measure of the damages which the patentee is entitled to recover, in case of an infringement, with interest upon the same from the time of infringement. In other words, if he is accustomed to sell a single right for the manufacture of a machine for twenty, thirty, forty, fifty, or one hundred dollars, and if that is his usual price for the right throughout the country, that fee, with interest from the time of the particular infringement, is the measure of damages for each infringement. But, if the patentee comes to the conclusion not to vend to others his rights under the patent, and not to avail himself of the proceeds of sales of his mere patent right, but to use the patented invention exclusively himself, and to furnish the products to the community himself, out of his own manufactory or establishment—in such cases, a different measure of damages is to be adopted by the jury. And that is this: If the patent is for a machine, an entire machine, the patentee is entitled, as damages in case of infringement, to the profits he could have made in constructing and vending his machine, over and above the mere profits arising out of its manufacture. By that we mean, the mere profits of its mechanical construction, and not the profits that grow out of the exclusive right to manufacture the invention under the patent. The latter belong to the patentee, while the former, the mere mechanical profits, are excluded from the damages. And, if the case is one of an improvement on a machine, then he is entitled, as a measure of damages, to all the advantages of the use of his patented improvement, excluding the profits of the manufacture, and excluding also the value, if any, of the use of the old machine. Now, so far as respects the benefits and advantages that a patentee would derive from an improvement on a machine, you see, at once, that they would depend very much, if not altogether, upon the usefulness of the machine with that improvement, compared with its usefulness without that improvement. Hence, you have found, in the course of the trial, that witnesses have been introduced for the purpose of ascertaining the relative value of the plaintiff's machine with the improvements in controversy, and of the same machine without those improvements. If the machine, stripped of those improvements, would be a useless article in the market, and if no person would buy it unless those improvements were annexed to it, then its value, so far as its utility is concerned, depends on those improvements; because they give it vitality and usefulness in the eye of the business community. Hence, it is proper to

make this discrimination, in canvassing the facts bearing upon the proper measure of damages. We think, therefore, upon the evidence in this case, that, if the plaintiff had adopted the policy, which it was his right to do, of being his own manufacturer, and of supplying the country himself with the products of his invention, he is entitled to the measure of damages which we have stated to be applicable to a case of that kind.

It is for you to say what damages the plaintiff has sustained at the hands of the defendants, as respects the three hundred machines complained of as infringements. The statute rule on this subject is a very simple one, and is really the only general guide to be observed. It is the 14th section of the act of July 4, 1836, and is as follows: "Whenever, in any action for damages for making, using, or selling the thing whereof the exclusive right is secured by any patent heretofore granted, or by any patent which may hereafter be granted, a verdict shall be rendered for the plaintiff in such action, it shall be in the power of the court to render judgment for any sum above the amount found by such verdict as the actual damages sustained by the plaintiff, not exceeding three times the amount thereof, according to the circumstances of the case." That is, the power is given to the court to treble the damages, in aggravated cases, but the jury are limited to the actual damages which the plaintiff has sustained. Therefore, looking at all the evidence in the case in respect to the three hundred machines, if they were made in violation of the patent, it is a question of fact for you to determine what are the actual damages which the plaintiff has sustained.

After the close of the charge, the defendants' counsel requested the court to charge the jury, that whether the adjustability of the inner iron of the plaintiff's divider was a necessary ingredient of his claim to the divider, was a question of fact for the jury to determine; and that, if it was such necessary ingredient, and if the defendants did not use it, they did not infringe that claim.

Upon this request the court charged the jury as follows: The inside iron in the plaintiff's divider is adjustable, so that it can be raised or lowered at pleasure. In heavy grain, that stands high and may be cut high from the ground, it is desirable to raise the reel sometimes, and then this inside iron can be raised also, to ensure the division of the grain, and to cause the reel to overlap and carry all the grain to the cutter. It is claimed by the plaintiff that, although the defendants use no inside iron, yet they attain the same result by the shape of the inside of their divider, which thus answers to the inside edge of the plaintiff's divider. The defendants insist that, assuming this to be true, their divider has no such adjustability as the plaintiff's, and is therefore distinguishable from it. The answer to that position is this: The adjustability does not vary the principle of operation of the divider. It enlarges its capacity, so that it may be the better worked in heavy grain. But the principle and mode of operation of the divider are the same, whether the inner iron be adjustable or not.

The jury found a verdict for the plaintiff for $7,750.

NOTE. Judgment having been entered on this verdict, the defendants carried the case, by writ of error, to the supreme court, where it is reported as Seymour v. McCormick, 19 How. [60 U. S.] 96. That court differed with the court below only as to one point—the construction of the second claim of the patent—and sustained its other rulings, and affirmed the judgment, except as to the costs in the court below.

[For other cases involving this patent, see note to McCormick v. Seymour, Case No. 8,726.]